**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 07-4382**

───────────

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

    v.

XAVIER VIDAL JENNETTE,

        Defendant - Appellant.

───────────

Appeal from the United States District Court for the Eastern District of North Carolina, at Raleigh.  W. Earl Britt, Senior District Judge.  (5:06-cr-00147-BR)

───────────

Argued:  May 14, 2010          Decided:  July 2, 2010

───────────

Before GREGORY, AGEE, and DAVIS, Circuit Judges.

───────────

Vacated and remanded by unpublished opinion.  Judge Gregory wrote the opinion, in which Judge Agee and Judge Davis joined.

───────────

**ARGUED:** Samuel A. Forehand, SAMUEL A. FOREHAND, PA, Raleigh, North Carolina, for Appellant.  Kristine L. Fritz, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee. **ON BRIEF:** George E. B. Holding, United States Attorney, Anne M. Hayes, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Raleigh, North Carolina, for Appellee.

───────────

Unpublished opinions are not binding precedent in this circuit.

GREGORY, Circuit Judge:

Xavier Jennette ("Jennette") appeals the sentence imposed after he was convicted of aggravated identity theft and wire fraud in the Eastern District of North Carolina. In particular, Jennette argues that the district court abused its discretion in denying his motion for substitute counsel. We hold that the district court erred in denying Jennette substitute counsel for his sentencing, and thus vacate his sentence and remand his case to the district court for resentencing.[1]

I.

In October 2003, Jennette was hired to work as the facilities security officer at Object Science Corporation ("OSC"), a government information technology contracting firm. In that capacity, he managed employees' personal information that was sent to the Department of Defense in order to maintain the employees' security clearances. He alone managed the access to the secure personal information database.

In November 2004, Jennette left OSC and moved to New Bern, North Carolina. There, he reconnected with his former

---

[1] As we vacate Jennette's sentence because he was denied substitute counsel, we do not address the other two arguments he raises: that the district court clearly erred in applying offense level enhancements and departing above the guidelines range; and that delays in filing his transcript on appeal denied him due process.

2

girlfriend, Toya Sadler ("Sadler"). Through Sadler, Jennette met Aiesha Horton ("Horton"). In July 2005, he asked Horton to obtain a mobile phone for him and provided her with a list of names and social security numbers to use to set up the account. The list contained the personal information of employees of OSC. Jennette selected Kimberly Barrus' name and information from the list to use to obtain the phone. Horton ended up procuring six phones that day in Barrus' name.

Because he was successful in using another person's information to obtain phones, Jennette found other ways to use the list. With Sadler, he acquired a Wal-Mart Discover Card using Jessica Nelson's information on July 10, 2005. They used the card to make purchases at restaurants, gas stations, furniture stores and Wal-Mart. After Jennette was arrested, some of the furniture they purchased was found at his mother's house.

Horton kept a copy of the list that Jennette had showed her when she obtained the phones, and Anthony Wallace ("Wallace"), her boyfriend, used it to obtain credit. Wallace, with Jennette's help, bought between fifty and seventy mobile phones, which they resold on the street. They made additional money by calling the phones that they sold and asking for payment for the phone service while posing as a Sprint representative. Finally, Wallace and Jennette used the list to obtain credit at Target,

3

Sears and Lowe's where they bought electronics and tools to resell and pawn. After Wallace was arrested, a printout from the database used to store OSC employees' personal information was found in his car.

Jennette was indicted with Sadler, Horton, and Wallace in a eleven-count indictment charging them with conspiracy (Count One), wire fraud (Counts Two through Eight), aggravated identity theft (Counts Nine and Ten), and obstruction of justice (Count Eleven). Counts Six through Eight and Eleven were dismissed by the court upon motion by the government prior to trial. Jeanette was tried by a jury. During trial, he took the stand in his own defense. He explained that he often printed copies of the list of OSC employees and their personnel information for his weekly meetings with personnel managers. As for the list found in Wallace's car, Jennette acknowledged that he was the one who printed it, but he denied any knowledge of the identity theft scheme. He stated that he did not know how the list was removed from OSC and how Sadler and the others had come to possess it. He testified that the mobile phone and furniture were both gifts from Sadler. The jury found him guilty on all of the remaining counts.

Jennette was scheduled for sentencing on March 7, 2007. On February 21, 2007, approximately two weeks before sentencing, his counsel moved for a continuance and moved to withdraw from

4

representation because "communications between counsel and the defendant have broken down to the point that it would be best for all parties if new counsel from outside the Office of the Federal Public Defender represents Mr. Jennette." J.A. 1057.[2] The government opposed the motion on the basis that the motion to withdraw did not state a valid reason for withdrawal, it was untimely, and the continuance would burden the victims who wanted to testify at sentencing. A week later, the government made a motion for an upward departure from the guidelines on the basis that the guidelines sentence understated the harm caused. In particular, the government argued that Jennette harmed 124 current and former OSC employees who were not considered victims under the guidelines.

At sentencing, the district court took up the motion to withdraw. Defense counsel represented that when he met with Jennette to go over the presentence report ("PSR"), their communication broke down so significantly that he did not believe they could cooperate going forward. Counsel stated that the root of the problem was that Jennette believed that he was "cast aside" at trial, and as a result they had not even been able to agree on what factual issues to challenge at sentencing. The court asked Jennette for his view and he stated, "Well your

---

[2] "J.A. __" refers to the joint appendix submitted by the parties on appeal.

honor, since, before, during, and after the trial, I have been severely dissatisfied with the representation that I have received from counsel." J.A. 1080-81. In particular, Jennette was dissatisfied with counsel's failure to raise certain issues important to him at trial and their inability to agree on objections to the PSR. Indeed, Jennette stated that they had been unable to even review the PSR because they could not communicate effectively.

The court denied the motion and decided to give Jennette the chance to make all of his objections to the PSR in open court by going through it with the judge. Jennette represented that he had already written down all of his objections, but that the paper was at the jail because he was told that he could not bring anything to court. As the judge went over the PSR, defense counsel made objections for Jennette; Jennette did not speak at all. Defense counsel objected to all the sentencing enhancements. He also argued against the government's motion for upward departure on the basis that it was only speculation as to the harm suffered, because not every employee's information was stolen and used and there was no basis whatsoever for fixing the loss at $1000 per person. The court continued the sentencing in order to have time to consider the motion for upward departure.

On March 30, 2007, the court reconvened and imposed sentence. The court granted the government's motion for upward departure on the basis that Jennette occupied a position of trust with respect to the victims and caused substantial harm to at least thirty-nine victims, resulting in a guidelines range of seventy-eight to ninety-seven months. Jennette was then sentenced to ninety-seven months imprisonment on Counts One through Five and twenty-four months on Count Nine to run consecutively. Jennette timely appealed.

## II.

The denial of a motion for substitution of counsel is reviewed for abuse of discretion. United States v. Corporan-Cuevas, 35 F.3d 953, 956 (4th Cir. 1994).

## III.

Jennette argues on appeal that his sentence should be vacated because the district court abused its discretion in denying his motion for substitution of counsel. Both he and his attorney represented that there had been a complete breakdown of communication between them such that they had not even reviewed the PSR together before sentencing. The government argues that mere allegations of dissatisfaction with counsel are insufficient to trigger the appointment of substitute counsel,

and if there was any error it was harmless because the district court went over the PSR with the defendant. We, however, agree with Jennette and hold that the district court abused its discretion in denying the motion.

A.

While a criminal defendant has a right to counsel of his own choosing, that right is not absolute. Powell v. Alabama, 287 U.S. 45, 52 (1932); Sampley v. Attorney Gen. of N.C., 786 F.2d 610, 612 (4th Cir. 1986). In particular, a defendant's right to choose his own counsel is limited so as not to "deprive the courts of the exercise of their inherent power to control the administration of justice." United States v. Gallop, 838 F.2d 105, 108 (4th Cir. 1988). It then follows that a defendant's right to receive substitute counsel after the court's initial appointment is similarly limited. Thus, a defendant must show good cause as to why he should receive substitute counsel. Id. In general, good cause exists when denying substitute counsel would deny the defendant a constitutionally adequate defense. United States v. Johnson, 114 F.3d 435, 443 (4th Cir. 1997) ("A total lack of communication is not required. Rather an examination of whether the extent of the breakdown prevents the ability to conduct an adequate defense is the necessary inquiry."); United States v. Mullen, 32 F.3d 891, 897 (4th Cir. 1994).

The district court has discretion to decide whether substitution of counsel is proper.  Gallop, 838 F.2d at 108.  In making its decision, the district court must consider both the defendant's reason for seeking substitution and the government's interest in proceeding without a continuance.  Morris v. Slappy, 461 U.S. 1, 11-12 (1983); United States v. Reevey, 364 F.3d 151, 157 (4th Cir. 2004).  In reviewing the district court's decision on a motion for substitution, this Court looks at three factors: the "[t]imeliness of the motion; [the] adequacy of the court's inquiry into the defendant's complaint; and whether the attorney/client conflict was so great that it had resulted in a total lack of communication preventing an adequate defense." Gallop, 838 F.2d at 108.

## B.

The Gallop factors counsel that the district court abused its discretion in denying the motion to substitute.  First, Jennette's motion was timely.  The motion was filed two weeks before his sentencing was scheduled.  Though at the time it was filed there were only two days before the defendant's objections to the PSR were due, the motion was still timely because it gave plenty of time for new counsel to be appointed and sentencing to continue.  Compare Mullen, 32 F.3d at 896 (holding that a motion for substitution filed twenty-three days before trial was timely), with United States v. Dukes, 1998 W.L. 188634, at *4

9

(4th Cir. Apr. 21, 1998) (unpublished) (holding that a motion for substitution filed ten days before the start of a multi-defendant trial was untimely). The government's argument regarding the other codefendants and coordination with the victims that wished to make a statement is somewhat disingenuous. The government can point to no particular victim that it anticipated testifying, and indeed no testimony was presented at sentencing. Additionally, Jennette had never made a motion for substitution or a continuance before. When a defendant makes a successive motion for continuance, the court may often scrutinize his reasons for seeking the substitution more carefully. See Gallop, 838 F.2d at 108 (discussing how a prior motion for substitution and continuance followed by another motion for substitution five days prior to trial betrayed the defendant's motivation to delay the trial and rendered his request untimely). Instead, here Jennette's motion to substitute counsel was timely and was his only request to do so.

As to the second Gallop factor, the district court did make an adequate inquiry into the cause of the problems between counsel and the defendant. Mullen, 32 F.3d at 896 ("When a defendant raises a seemingly substantial complaint about counsel, the judge has an obligation to inquire thoroughly into the factual basis of defendant's dissatisfaction." (citation

10

and internal quotation marks omitted)). The district judge here asked both defense counsel and the defendant about the problems they were experiencing, both in terms of cause and effects, and received lengthy replies on the record.

Although the district court adequately addressed the second Gallop factor, the extent of the breakdown in communication between Jennette and his counsel was so significant that it mandated substitution of counsel under the third factor. As stated above, the defendant must have good cause for seeking substitute counsel, and a breakdown in communication which denies the defendant an adequate defense constitutes good cause. Here, the evidence before the district court was that communication had broken down between the defendant and his counsel so significantly that they could not come to an agreement on what objections to make to the PSR, and indeed had not even had the chance to go over it together. The government argues that instead of a breakdown in communication, Jennette only generally disagreed with how counsel had handled the trial. While generalized disagreement with counsel is not a sufficient reason for substitution, here the adverse impact was beyond mere disagreement, such that there was a "total lack of communication" in this case. Gallop, 838 F.2d at 109. Both defense counsel and Jennette stated that they had not had a chance to review the PSR together, and indeed had not really

11

spoken since the trial concluded, certainly a fundamental step for adequate representation at sentencing.

We must therefore determine whether that lack of communication deprived the defendant of an adequate defense at sentencing. The government argues that because the district judge went over the PSR with Jennette in open court, any error in failing to substitute counsel was harmless. This argument must fail for two reasons. First, the district court must have found a significant problem with communication between Jennette and his counsel, as the district court conducted what otherwise would have been counsel's duty, the initial review of the PSR with the defendant. The district court's assumption of this role demonstrated that it had found merit in counsel's and Jennette's claim that there was a breakdown in communication. Although laudable, going over the PSR with the district judge in open court can hardly be said to substitute for a private, attorney-client-privileged conversation with counsel before sentencing even begins. Additionally, though defense counsel did make objections, those objections cannot be said to have been effective because they were pro forma and without the benefit of consultation with the defendant beforehand.[3] See

---

[3] Indeed, counsel represented at oral argument that during sentencing, had counsel and Jennette been able to work together, (Continued)

<u>Mullen</u>, 32 F.3d at 897 (discussing how the inability to confer with the defendant before trial denied the defendant an adequate defense).

Therefore, given the effects of the breakdown in communication, the failure to substitute Jenette's counsel was an abuse of discretion.

IV.

For the reasons detailed above, we vacate Jennette's sentence and remand his case to the district court for resentencing.

<u>VACATED AND REMANDED</u>

---

counsel likely would have introduced testimony from several witnesses, including Jennette's family and supervisors at work.

13